UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

KATHY JO SIMMONS,                               :

                 Plaintiff,          :

       -against-                               :

COMMISSIONER OF SOCIAL SECURITY,   :

           Defendant.          :

---------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/8/15
```

**OPINION AND ORDER**

13cv5504-FM

**FRANK MAAS**, United States Magistrate Judge.

       Plaintiff Kathy Jo Simmons ("Simmons") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits.  The parties have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  This Opinion and Order explains why the Commissioner's motion, (ECF No. 21), has been granted, and Simmons' cross-motion, (ECF No. 23), has been denied.

I.      Background and Procedural History

On December 8, 2010, Simmons filed an application for Social Security

disability insurance benefits, alleging that she became disabled on June 1, 2007.  (Tr. 140-

46).[1]  On May 6, 2011, after the Social Security Administration ("SSA") denied her

application initially, Simmons and her counsel requested a de novo hearing before an

Administrative Law Judge ("ALJ").  (Id. at 98-103, 108-09).  That hearing was held

before ALJ Katherine Edgell on January 18, 2012.  (Id. at 36-71).  On March 12, 2012,

ALJ Edgell issued a written decision in which she determined that Simmons was not

disabled within the meaning of the Act.  (Id. at 23-35).  That decision became the final

decision of the Commissioner on May 31, 2013, after the Appeals Council denied

Simmons' request for further review.  (Id. at 1-5).

On August 7, 2013, represented by different counsel, Simmons filed this

action seeking review of the Commissioner's final decision.  (ECF No. 2).  Both parties

subsequently consented to my jurisdiction for all purposes.  (ECF No. 16).  The

Commissioner moved for judgment on the pleadings on July 7, 2014, (see ECF Nos. 21,

22), and Simmons cross-moved for judgment on the pleadings on July 21, 2014, (see ECF

Nos. 23, 24).  The Commissioner further filed a reply memorandum of law on August 4,

2014.  (ECF No. 25).  No further briefing having been received since then, both motions

are deemed fully submitted.

---

[1]      Citations to "Tr." refer to the certified copy of the administrative record filed with
the answer.  (ECF No. 12).

2

The Commissioner asserts that the ALJ's decision is legally correct and supported by substantial evidence, while Simmons contends that the ALJ's residual functional capacity determination ("RFC"), assessment of Simmons' credibility, and conclusion that Simmons can perform past relevant work, are not supported by substantial evidence.

II.    Factual Background

A.    Non-Medical Evidence

Simmons was born in 1955, and was fifty-six years old at the time of her hearing.  (Tr. 41).  She completed high school, but has had no further vocational training or education.  (Id. at 41-42, 171-72, 185-86).  She last worked from 2005 until 2007 as as a housekeeper at a hotel in Middletown, New York.  (Id. at 42).  Between 2004 and 2006, Simmons also worked as a restaurant hostess at the Monticello Raceway.  (Id. at 44).  Simmons testified that in the course of that job, she had to take reservations, greet and seat patrons, take orders, set and clear tables, work the cash register, and occasionally work in the kitchen and "get big platters."  (Id. at 44).   Between approximately 2006 and November 2011, Simmons also sold Avon products, working four hours per day, and, shortly before the hearing before the ALJ, had begun attempting to sell homemade gift baskets on eBay.  (Id. at 55-56, 60).

Simmons testified that she was unable to work because of incontinence, neck stiffness, and back pain due to scoliosis.  (Id. at 48-49; see also id. at 166).  Simmons claimed that her chronic orthopedic pain stemmed from an automobile accident

in 2007 and a second one in 2008.  (Id. at 43, 50).  According to Simmons, her neck

would "lock[]" to the point where she could not turn it or bend it forward and back (id. at

48-49); her back pain prevented her from "stand[ing] too long" and from sitting for more

than fifteen minutes, and often forced her to sleep in a recliner at night (id. at 49, 65-66);

she often could not "hold [her] bladder" (id. at 65); could not lift or hold a gallon of milk

with her right hand and occasionally had numbness in her hands (id. at 67); and could

reach forward, but not overhead, and squat and crouch, but not bend over to pick things

up from the ground (id. at 67-69).

Simmons testified that during the course of a typical day, her medical

conditions prevented her from making the bed, reaching for dishes in her kitchen cabinets

(id. at 54-55), or shopping and cooking (id. at 61); limited her to only light cleaning (id. at

62); prevented her from lifting a laundry basket (id.); limited to one-half hour the time she

could spend on her computer pursuing her gift-basket-making business (id. at 55); and at

times prevented her from working at all (id. at 61).  Nevertheless, Simmons attended

community events, walked twenty to thirty minutes per day when the weather permitted,

and did home therapy exercises recommended by her doctor.  (Id. at 62-63).

B.     Medical Evidence

The medical evidence is set forth in considerable detail in the parties'

briefs.  (See ECF No. 22 (Comm'r's Mem. of Law) ("Def.'s Mem."); ECF No. 24 (Pl.'s

Mem. of Law) ("Pl.'s Mem.")).  That evidence establishes that Simmons received

continuing medical treatment after both her 2007 and 2008 automobile accidents.

      1.    <u>Treatment After the First Accident</u>

Following the first accident, which occurred in Alabama, Simmons declined transportation by ambulance, but went to an emergency room, where she reported having been stopped at a light when her vehicle was rear-ended by another vehicle traveling at a low speed. (Tr. 221, 224). Simmons presented with a mild injury to her neck – causing muscle spasms and pain upon movement – and a seat belt abrasion on her left shoulder. (<u>Id.</u> at 221, 223). The radiologist's impressions included "focal arthritic change at [the] C5-6 [level]" and "loss of the normal cervical curve," possibly as "a function of muscle spasm." (<u>Id.</u> at 226). Simmons spent approximately four and one-half hours at the hospital before being discharged. (<u>Id.</u> at 221).

After her return to New York, Simmons underwent a series of imaging studies. An MRI of her cervical spine on June 20, 2007, revealed "[m]ild flexion deformity" and "mild rotatory scoliosis," which "raise[d] the possibilities of facet injury."[2] (<u>Id.</u> at 228). "Diffuse degenerative changes [of] the discs with focal bulges at C4-5 through C6-7" also were detected. (<u>Id.</u>). An MRI of Simmons' lumbar spine on July 12, 2007, revealed "degenerative spondylosis[3] [of the] L4-5 and L5-S1 [vertebrae]

---

      [2]    A "facet" is a "small smooth area on a bone or other firm structure." <u>Stedman's Medical Dictionary</u> (27th ed. 2000) ("<u>Steadman's</u>"), available at WL 313360.

      [3]    "Spondylosis" is a stiffening or fixation of the vertebra, and is a term "often applied nonspecifically to any lesion of the spine of a degenerative nature." <u>Stedman's</u>, WL 840410.

with diffuse disc bulges" and "partial sacralization[4] of [the] L5 [vertebra]," but "no acute disc herniations." (Id. at 229). Finally, an MRI of Simmons' thoracic spine on August 13, 2007, revealed "focal dextroscoliosis[5] in the mid-thoracic spine" to which "splinting or spasm may contribute." "No thoracic disc herniation [was] identified." (Id. at 230-31).

While these studies were underway, on June 21, 2007, Simmons visited Dr. Govindlala Bhanusali, an orthopedic surgeon. (Id. at 319-20). Simmons reported significant pain in her neck and lower back, headaches, and numbness and tingling in both hands. (Id. at 319). "Examination of [her] cervical spine revealed mild tenderness," but nearly a full range of motion, as well as the absence of "any excruciating pain." (Id. at 320). Simmons had "tenderness in [her] lower lumbar spine," and her range of movement was "painful and limited," but there was no muscle spasm. (Id.). Examination of Simmons' shoulders, elbows, and wrists revealed a full range of motion and nothing abnormal. (Id.). Straight leg raising was sixty degrees on both sides, and deep tendon reflexes were described as "2+" in all extremities. (Id.). An x-ray revealed degenerative changes in her cervical spine, but no fractures or dislocation. (Id.). Dr. Bhanusali

---

[4]     "Sacralization" is the "anomalous fusion of the fifth lumbar vertebra to the first segment of the sacrum, so that the sacrum consists of six segments." Dorland's Illustrated Medical Dictionary 1662 (32d ed. 2012).

[5]     "Dextroscoliosis" is a curvature of the spine to the right. See www.spine_health.com/conditions/scoliosis/scoliosis-types (last visited May 8, 2015). "Levoscoliosis" is a curvature of the spine to the left. (Id.).

advised Simmons to continue to refrain from working and prescribed Oruvail.[6]  (Id.).  A

follow-up visit with Dr. Bhanusali on July 21, 2008, led to similar findings.  (Id. at 321).

       Simmons received continuing chiropractic treatment from June 13, 2007,

through January 8, 2008.  (See id. at 260-94).  Simmons also had eight weeks of physical

therapy beginning October 1, 2007.  (Id. at 244).  On or about June 18, 2007, one of her

chiropractors, Dr. Deborah Cassidy, opined that Simmons would not be able to return to

work until August 1, 2007.  (Id. at 274; see also id. at 267 (form dated June 18, 2007,

certifying need for FMLA leave)).  On January 7, 2008, another chiropractor, Dr.

Christine Kmiec, indicated that Simmons was partially disabled and unable to return to

work due to, inter alia, disk bulges and a limited and painful range of motion in her

cervical and lumbar spine.  (Id. at 277).

       After the first accident, Simmons also consulted with other physicians.  On

August 21, 2007, Simmons visited Dr. Steven Jacobs, a neurosurgeon.  (Id. at 242).

Simmons reported radiating neck pain and back pain, "exacerbated by activity and

relieved by rest," as well as "numbness and tingling in both hands."  (Id.).  Dr. Jacobs

observed a "decreased range of motion of the neck laterally to the left."  (Id.).  Dr. Jacobs

also reviewed Simmons' three prior MRI examinations.  The doctor noted a "flexion

deformity and rotary scoliosis" in Simmons' cervical spine, as well as "bulging discs at

C4-5, C5-6 and C6-7," "degenerative spondylosis [in her lumbar spine] at L4-5 and L5-

---

[6]     Oruvail is a nonsteroidal anti-inflammatory drug.  See http://www.drugs.com/cdi/
oruvail-extended-release-capsules.html (last visited May 8, 2015).

S1 with bulging discs," and the absence of "any herniated disc" in her thoracic spine.  (Id. at 242).  Dr. Jacobs ordered a CT of Simmons' cervical spine, flexion extension films and a brain CT.  (Id.).  The cervical spine CT revealed "moderate degenerative disc disease . . . at C4-C5, C5-C6 with reversal of the normal cervical lordosis, but no fracture or facet dislocation or subluxation."  (Id. at 245).  X-rays of the cervical spine yielded similar results.  (Id. at 246).  The CT scan of Simmons' brain showed "no abnormal intra or extraaxial collections or hemmorhage[, n]o abnormal masses or mass effect[,] . . . [n]o accute cortical infractions," and ultimately, "no focal or intracranial lesion."  (Id. at 247).

At a September 11, 2007 follow-up examination, Dr. Jacobs noted that the cervical spine CT and flexion extension films were "all negative," with "no dislocation and no facet fracture."  (Id. at 241).  Dr. Jacobs stated that Simmons' "exam continues to be benign" and ordered physical therapy, but did not "see any indication for surgery."  (Id.).

On October 31, 2007, Dr. Raymond Hui, Simmons' primary care doctor, diagnosed Simmons with costochondritis and Raynaud's syndrome.  (Id. at 51, 378).  On January 11, 2008, Dr. Hui diagnosed Simmons as suffering from Raynaud's syndrome, along with high blood pressure.  (Id.).[7]

On October 31, 2007, Simmons visited Dr. Valpet Sridaran, a physiatrist, reporting headaches, neck stiffness, neck pain that tended to radiate into her upper

---

[7]      Dr. Hui's notes of his examinations of Simmons are handwritten and, in large part, difficult to decipher.  (See Tr. 377-80).

extremities, and back pain that had not abated despite therapy and medications.  (Id. at 360).  Dr. Sridaran noted that Simmons' neck movements were "guarded [and] lacking spontaneous movements," but that she was able to "transfer, sit, stand and move about without assistance."  (Id. at 361).  He further reported "tenderness in the paracervical muscles as well as the upper torso muscles bilaterally" and "tenderness at the C5-C6 level."  (Id.).  Dr. Sridaran found that Simmons' "[p]assive range of motion of the neck [was] voluntarily restricted and guarded."  (Id.).  With respect to Simmons' back, he noted "diffuse paralumbar muscle tenderness on [Simmons'] right side," finding that Simmons could rotate up to twenty degrees to either side without experiencing pain.  (Id.).  Dr. Sridaran recommended trigger point injections in the areas where Simmons was experiencing pain, but she declined that treatment.  (Id. at 362).

Simmons visited Dr. Sridaran again on November 29, 2007.  (Id. at 358-59).  Dr. Sridaran observed "mild tenderness in [Simmons'] lower spinal region in L3-S1 and in the paralumbar region," and that her "[f]lexion and extension [were] voluntarily restricted."  (Id. at 358).  There was "mild weakness in the flexors and extensors of the neck," as well as "[m]ild tenderness in the right paracervical region;" additionally, her "[p]assive range of motion of the neck [was] voluntarily guarded and restricted."  (Id.).  Dr. Sridaran concluded that Simmons had a cervical sprain, carpal tunnel syndrome, lumbosacral radiculopathy, and occipital neuralgia.  (Id. at 359).

During a follow-up visit on January 4, 2008, Simmons complained of "generalized body pain, easy fatigability, and sleeplessness."  (Id. at 357).  Dr. Sridaran

9

reported "diffuse tenderness in the paravertebral muscles including the cervical, thoracic, and paralumbar regions with islands of trigger points."  (Id.).  He found possible signs of fibromyalgia, and concluded Simmons had a "temporary mild disability" and that she "cannot do any heavy lifting."  (Id.).

On January 10, 2008, Simmons consulted Dr. Sunitha Polepalle, a pain management specialist.  (Id. at 299-300).  Simmons presented complaining of back, neck and bilateral shoulder pain, aggravated by "[b]ending, pushing, pulling, lifting, standing, and sitting," as well as "paraesthesias[8] in her arms."  (Id. at 299).  Physical examination revealed restrictions in neck movement, positive results for Phalen and Tinel signs,[9] primarily in Simmons' right hand, and negative straight leg raising, but that lateral leg rotation increased her pain.  (Id. at 300).  Dr. Polepalle assessed Simmons as having a "history of myofascial pain," found "[h]er back pain [was] due to lumbar facet dysfunction," found "upper extremity paresthesias," and noted "aneurysmal dilation[10] . . . on the MRI of the cervical spine."  (Id.).  Dr. Polepalle recommended

---

[8]        "Paraesthesia" is defined as a "spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking)" which "may be due to lesions of both the central and peripheral nervous systems."  Stedman's, WL 653800.

[9]        In a "Phalen maneuver" "the wrist is maintained in volar flexion; paresthesia occurring in the distribution of the median nerve within 60 seconds may indicate carpal tunnel syndrome."  Stedman's, WL 526130.  "Tinel signs" are defined as "a sensation of tingling, or of 'pins and needles,' felt . . . along the course of a nerve when [it] is percussed" thereby indicating a "partial lesion or early regeneration in the nerve."  Id. at WL 820740.

[10]       An "aneurysm" is defined as "[c]ircumscribed dilation of an artery or a cardiac chamber."  Stedman's, WL 38380.  The term "aneurysmal" is defined as "[r]elating to an aneurysm."  Id. at WL 38910.

trigger point injections.  (Id.).  On February 16, and March 15, 2008, Simmons had

follow-up visits with Dr. Polepalle who recommended continued physical therapy and

treatment with heat.  (Id. at 297-98).

On June 3, 2008, Simmons underwent an MRI of her left shoulder at the

Orange Regional Medical Center.  (Id. at 324).  The radiologist's impresssions were

"supraspinatus tendinopathy, partial thickness tear vs. tendonitis," but with "no evidence

of full thickness tear of the rotator cuff;" "mild subacromial bursitis;" "small

glenohumeral joint effusion;" and "mild hypertrophic degenerative osteoarthritic changes

of the acromioclavicular joint with inferior osteophytes . . . consistent with an

impingement syndrome."  (Id. at 325).

### 2.   Treatment After the Second Accident

On September 8, 2008, Simmons was transported by ambulance to the

Orange Regional Medical Center in Middletown, New York, after a second automobile

accident.  (Id. at 381-405).  Simmons was admitted at 1 p.m. and discharged at 2:35 p.m.

(Id. at 384, 388).  She complained primarily about back pain.  (Id. at 389).  A physical

examination revealed "mild [right-sided]" tenderness of the supravlavicular ("SCM") and

trapezius muscles, "[n]o spinal tenderness[, f]ull range of motion of [her] cervical spine,"

"[p]ositive right sided paralumbar muscle tenderness[, n]o vertebral tenderness . . . [and a

f]ull range of motion" with "no tenderness" in her back.  (Id. at 392).  Upon her

discharge, Simmons received a form stating that she could return to work without

restriction on September 4, 2008.  (Id. at 403).

On September 23, 2008, Dr. Polepalle ordered an MRI of Simmons' thoracic spine, which revealed dextroscoliosis, but "no evidence of disc herniation or significant stenosis," or "abnormal cord signals." (Id. at 326).

On November 4, 2008, Simmons visited Dr. Sridaran. (Id. at 354). Dr. Sridaran noted that Simmons complained of "pain in [her] neck, shoulders, mid and low back region, hips and lower extremities," which was "aggravated by any strenuous activity" and left her "unable to do household chores." (Id.). Dr. Sridaran noted that Simmons "appear[ed] to be apprehensive and anxious" and that her "movements [were] guarded." (Id. at 355). He also noted that Simmons' "[p]assive range of motion of the neck [was] resisted and voluntarily restricted," and that she had mild tenderness in her right paracervical region. (Id.). There also was mild tenderness of the right side paralumbar muscles in Simmons' mid and low back. (Id.). Simmons "resisted straight leg movements . . . with much force" but had normal range of motion in her leg joints. (Id.). Simmons' "[r]ight shoulder abduction [was] . . . painful and restricted," limited to thirty degrees, and met with "very hard resistence." (Id.). Simmons was able to "abduct and move [her] arm and rotate [her] shoulder on the left side when she [was] supine." (Id.). Her muscle tone was normal but "hard to assess" because she was "really rigid and resist[ed] any passive movement." (Id. at 356). Dr. Sridaran assessed Simmons as exhibiting "Cervical Radiculitis,"[11] "Post-traumatic headache," "Right shoulder

---

[11]     "Radiculitis" is defined as a "[d]isorder of the spinal nerve roots." Stedman's, WL 748650.

12

tendonitis," and "Sciatica," and found that she had a "partial, temporary disability –

50%." (Id. at 356).

On December 29, 2008, Simmons

complained of "increasing left shoulder pain," which left her unable to raise her left arm

above her chest, and "constant deep-seated pain in the neck." (Id. at 352).  Dr. Sridaran

found that Simmons "appear[ed] to be in distress," and had "mild antalgia," "paracervical

muscle tenderness" and "suboccipital region tenderness," with a positive compression test

for radicular symptoms on her left side, and a "Tinel sign for greater occipital nerve

compression" on her left side.  (Id.).  Her left forearm and hand "appear[ed] diffusely

swollen, suggesting dependent edema," and her "Tinel sign for median nerve

compression [was] also positive."  (Id.).  There also was "dense paralumbar muscle

tenderness."  (Id.).  Dr. Sridaran's impression was history of automobile accident with

"[c]ervical region pain with left upper extremity pain – rule out cervical radioculopathy,"

"occipital neuralgia," "[l]eft shoulder rotator cuff syndrome," "[l]umbosacral

sprain/lumbago," and "rule out carpal tunnel syndrome."  (Id. at 352-53).

On January 19, 2009, Simmons visited Dr. Bhanusali  (Id. at 328).  At that

time, Simmons reported pain in her left shoulder, worsening numbness in her left hand,

neck pain, and "lumbosacral spine pain." (Id.).  Simmons' left shoulder, cervical spine

and lumbosacral spine were tender, but her range of movement was limited only in her

lumbosacral spine.  (Id. at 329).  Her straight leg raising on both legs was sixty degrees,

and her Tinel and Phalen signs were positive, predominantly on the left hand.  (Id.).  An

x-ray revealed arthritis and calcification in Simmons' left shoulder, but no fracture or dislocation.  (Id.).  An MRI of Simmons' left shoulder a few days later revealed "minimal subacromial bursitis," no evidence of atrophy, trace joint effusion, and no evidence of a frank tear.[12]  (Id. at 329-30).  Dr. Bhanusali's findings on follow-up visits on January 30 and February 23, 2009, were substantially similar.  (Id. at 334-38).  An MRI on February 9, 2009, revealed "[r]eversal of the normal cervical lordosis at C5-C6 with disc bulge osteophyte complex identified" and "mild cord impingement with no myelomalacic changes identified."  (Id. at 336).  Dr. Bhanusali advised Simmons to do "modified work" limited to "not lifting more than [fifteen pounds]."  (Id. at 338).

Simmons saw Dr. Sridaran again on February 10, 2009.  (Id. at 351).  He noted that Simmons "appear[ed] apprehensive," that "[h]er neck movements [were] voluntarily guarded," and that her "left upper extremity muscle strength could not be fully assessed because [Simmons] tend[ed] to voluntarily restrict her effort."  (Id. at 351).  There also was mild tenderness in her neck.  Dr. Sridaran opined that Simmons' history of left-sided headaches was "probably due to posttraumatic cephalgia."[13]  (Id.).  On March 30, 2009, Dr. Sridaran indicated he was no longer active in Simmons' treatment and that she was on "temporary, moderate disability," but he cleared her to return to full work status on May 1, 2009.  (Id. at 350).

---

[12]     A "frank tear" is one that is "[u]nmistakable[,] manifest[, or] clearly evident." Stedman's, WL 354450.

[13]     The term "posttraumatic cephalgia" appears to be synonymous with "posttraumatic headache."  See Stedman's, WL 161870, WL 394260.

On August 3, 2009, Simmons visited Dr. Neal Dunkelman, a physical medicine/physical rehabilitation specialist, whom she also saw for follow-up visits on August 27, October 1, November 4, and December 28, 2009.  (Id. at 475, 477, 478, 482, 486-87).  Dr. Dunkelman reported that Simmons had tenderness in her shoulders (id. at 475, 477, 487), tenderness and spasm in her cervical back (id. at 475, 477, 478, 482, 487), and restricted cervical range of motion (id. at 477, 487).  Simmons nevertheless had normal muscle tone, symmetrical reflexes, no sensory deficits and no atrophy.  (Id. at 477, 478, 482, 487).  An MRI of Simmons' cervical spine on August 19, 2009, revealed "[b]road based annular bulging at C5-C6 and C6-C7 each of which cause[d] some mild proximal equivalent neural foraminal narrowing," as well as "reversal to the normal lordotic curvature of the cervical spine."  (Id. at 481).  Additionally, MRIs of Simmons' shoulders taken that month revealed "[m]ild tendinosis . . . without evidence for tendon tear" on the right shoulder (id. at 484), and "[m]ixed signal within the suprapinatus tendon suggestive of tendinosis,"[14] but "[n]o evidence for rotator cuff tear" or "glenoid labral tear" in the left shoulder (id. at 485).  Dr. Dunkelman concluded that Simmons suffered from cervical radiculopathy and bilateral shoulder sprain.  (Id. at 475, 477, 478, 482, 487).  Dr. Dunkelman opined that Simmons was unable to work and provided her

---

[14]     "Tendinosis" is defined as "a degeneration of the tendon's collagen in response to chronic overuse."  Evelyn Bass, Tendinopathy:  Why the Difference Between Tendinitis and Tendinosis Matters, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3312643/ (last visited May 8, 2015).

with disability certificates periodically during the time from August through December 2009.  (Id. at 476, 479, 480, 488).

In 2010, Simmons visited Dr. Dunkelman on January 25, March 24, and April 26.  (Id. at 468-74).  Dr. Dunkelman again concluded that Simmons suffered from cervical radiculopathy and bilateral shoulder pain after Simmons presented with neck and shoulder pain, along with cold and numbness in her hands.  (Id. at 468, 470, 473).  Dr. Dunkelman provided Simmons with disability certificates indicating she was "totally incapacitated" from December 28, 2009, through March 8, 2010 (id. at 472, 474), and March 25 through May 24, 2010 (id. at 469, 471).

On July 27, 2010, Simmons visited Dr. Adam Carter, a physical medicine and rehabilitation expert.  (Id. at 489-92).  Simmons complained of neck and back pain, along with numbness and tingling in her hands.  (Id. at 489).  Upon examination, Dr. Carter noted that Simmons' mobility was "minimally impaired," that she did not require ambulatory aids, and that she was able to stand with ease and walk normally.  (Id. at 490).  Dr. Carter found decreased range of motion in Simmons' neck, along with "bilateral paracervical tenderness," and decreased range of motion in her lumbar spine accompanied by tenderness, but that "[a]ll joints of the [upper and] lower extremities show[ed] range of motion . . . within normal limits."  (Id. at 490-91).  Dr. Carter assessed Simmons as suffering from "[t]raumatic cervical pain syndrome, [t]raumatic lumbar spine pain syndrome[, and i]ncreased pain of underlying neck and lower back pain syndrome."  (Id.

at 491).  Dr. Carter concluded Simmons was "partially disabled" due to injuries directly

caused by her car accidents.  (Id. at 491-92).

At a follow-up examination on August 31, 2010, Simmons reported

"ongoing neck pain, numbness and tingling in her right hand," but Dr. Carter found "no

appreciable changes" from his initial examination.  (Id. at 497).  At another follow-up

examination on September 30, 2010, Simmons continued to complain of "ongoing neck

and low back pain."  Upon examination, Dr. Carter noted "tenderness to palpation over

the cervical and lumbar paraspinals," but five out of five strength in the upper and lower

limbs.  (Id. at 498).  His impression was cervical radiculitis, low back pain syndrome, and

cervical spine pain syndrome.  (Id.).

On November 16, 2010, Simmons began monthly visits with Dr. Steven

Weinstein, an orthopedist.  (Id. at 52, 501-03).  Simmons initially complained of "neck,

shoulder and back pain," and difficulty with both sitting and standing.  (Id. at 501).  Upon

examination, Dr. Weinstein reported Simmons' "[l]umbar flexion [was] full with pain at

end range" and that her "[e]xtension [was] full in the lumbar spine."  (Id. at 502).  There

was some limitation in Simmons' neck, and "markedly limited active right and left

cervical rotation."  (Id.).  Dr. Weinstein noted that Simmons exhibited "decreased effort"

with hand grip strength testing, but also that she "reported decreased sensation in the

bilateral hands," along with "decreased sensation throughout the left lower extremity."

(Id.).  There was no atrophy or tenderness in any extremities.  (Id.).  Dr. Weinstein's

review of the August 2009 MRIs revealed "broad based disc bulges at C5-6 and C6-7,"

"[r]eversal of normal lordosis" in Simmons' cervical spine, and "supraspinatus tendinosis" in her left upper extremity.  (Id. at 503).  Dr. Weinstein's impression was that Simmons suffered from a neck sprain, cervical disc degeneration, and rotator cuff syndrome, but he also noted that Simmons "presents with some degree of symptom amplification."  (Id.).

On May 25, 2011, Dr. Jeffrey Degen, an orthopedic surgeon, examined Simmons at Dr. Weinstein's request.  (Id. at 528-29).  Dr. Degen noted that Simmons' "worst pain [was] in the mid thoracic region particularly on the right side[and] radiate[d] around to the lateral aspect of the thorax."  (Id. at 528).  He stated that Simmons' pain was "severe and constant and . . . worsened with sitting."  (Id.).  Simmons also had intermittent neck pain radiating to her shoulders, and "chronic numbness" in her hands.  (Id.).  Simmons had a "normal gait and station," and "a normal range of motion" in her extremities, but she exhibited "give way weakness throughout the upper and lower extremities."  (Id. at 529).  Simmons' reflexes and sensation were normal.  (Id.).  Dr. Degen reviewed several radiological studies, noting "a kyphosis[15] at C5/6 without spinal cord compression," "significant thoracic dextroscoliosis," and "likely . . . levoscoliosis" in her lumbar spine.  (Id.).  X-rays showed "moderately severe lumbar scoliosis of [thirty-three] degrees."  (Id. at 530).  Dr Degen concluded that Simmons' pain was "almost certainly related to her thoracic scoliosis," and that the "severity of her symptoms . . . may

---

[15]      "Kyphosis" is defined as " [a]n anteriorly concave curvature of the vertebral column," or "[a] forward (flexion) curvature of the spine."  Stedman's, WL 473880.

well require surgical intervention."   He therefore referred her to a neurosurgeon who

specialized in scoliosis for further evaluation.  (Id. at 529).

> 3.   Consulting Sources

On June 30, 2007, in connection with a lawsuit stemming from the first

accident, Dr. Michael Brooks reviewed the MRI of Simmons' cervical spine taken on

June 20, 2007.  (Id. at 254).  Dr. Brooks' impression was that Simmons suffered from

"[m]ultilevel cervical spondylosis" and "[c]entral disc herniation at C4-C5," but that these

conditions were "superimposed upon" underlying "chronic and longstanding degenerative

changes," characterized by "disc degeneration, disc bulging, disc space narrowing, bone

spur formation, and degenerative change in the joints in the spine."  (Id. at 255).  He

failed to detect "compression of the spinal cord or nerve roots, . . . fracture or bone

displacement[, or] . . . bone destruction."  (Id.).

On April 28, 2008, at the request of the New York State Division of

Disability Determination, Dr. Steven Rocker conducted a consultative internal medicine

examination of Simmons.  (Id. at 301-04).  Simmons complained chiefly about neck and

back pain stemming from the 2007 auto accident.  (Id. at 301).  Simmons reported that

she was able to clean, cook, do the laundry, shop, and care for herself.  (Id.).  Dr. Rocker

reported that Simmons could "walk on [her] heels and toes without difficulty," could

squat, and get on and off the exam table without assistance, and could "rise from [a] chair

without difficulty."  (Id. at 302).  Simmons exhibited a range of motion of the cervical

spine consisting of "[thirty] degrees extension, [twenty] degrees forward flexion, full

19

right and left rotation, [twenty] degrees right and left lateral flexion."  (Id. at 302-03).  Dr.

Rocker further found "[n]o scoliosis, kyphosis, or abnormality in [her] thoracic spine,"

"full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally" in

her lumbar spine, a full range of motion in her arms and legs, including all joints, which

he characterized as "stable and nontender," and "[s]trength [of] 5/5 in upper and lower

extremities."  (Id. at 303).  He noted "[n]o motor or sensory deficit," "no muscle atrophy

evident" in Simmons' extremities, and that her "[h]and and finger dexterity [was] intact,"

with "[g]rip strength 5/5 bilaterally."  (Id.).  A cervical spine x-ray revealed no fracture,

"very mild anterolisthesis[16] of C4 on C5," and "disc thinning . . . at C4-C5, C5-C6 and

C6-C7."  (Id. at 305).  There was no "prevertebral soft tissue swelling" or "cervical rib."[17]

(Id.).  Dr. Rocker diagnosed Simmons with "[p]osttraumatic arthralgia/myalgia of

cervical spine" and well-controlled hypertension.  (Id. at 303).  Based on his physical

examination, Dr. Rocker concluded that Simmons suffered from "[n]o limitation

for . . . sitting, handling, standing, or walking," but "moderate limitation for lifting and

carrying."  (Id.).

　　　　On October 21, 2008,  Dr. Paul Jones, a board certified orthopaedic

surgeon, examined Simmons at the request of "Independent Physical Exam Referrals."

---

[16]　　　"Anterolisthesis" is an abnormal positioning of "the upper vertebral body
. . . compared to the vertebral body below it.  More specifically, the upper vertebral body slips
forward on the one below."  Anterolisthesis, https://www.cedars-sinai.edu/Patients/
Health-Conditions/Anterolisthesis.aspx (last visited May 8, 2015).

[17]　　　"Cervical rib" is defined as "a supernumerary rib articulating with a cervical
vertebra, usually the seventh, but not reaching the sternum anteriorly."  Stedman's, WL 784150.

(Id. at 428-31).  Dr. Jones found that Simmons' cervical and shoulder motion was limited, and that she had a tender trapazius area.  (Id. at 429).  Dr. Jones diagnosed Simmons with cervical and lumbar syndrome, with a guarded prognosis, and he opined that Simmons had not yet reached pre-injury status.  (Id. at 430).  He found that Simmons was "not able to return to preloss activity levels, including occupational duties," and had to "avoid lifting above shoulder level, bending and lifting of more than [ten pounds]."  (Id. at 430-31).  Finally, Dr. Jones noted that "[w]ith regard to her right shoulder, it is not clear if her symptoms are emanating from her neck or if there are intrinsic shoulder problems."  (Id. at 431).

Dr. Jones evaluated Simmons again on June 1, 2010.  (Id. at 532-34).  At that time, the forward flexion of her left and right shoulders was, respectively, 120 and 80 degrees, her abduction was sixty degrees, and the rotation of her left shoulder was normal, although Simmons "would not attempt internal rotation of the right shoulder." (Id. at 533).  Her grip strength, reflexes and sensation were normal.  (Id.).  Her "[c]ervical, trapezius and interscapular areas were tender," particularly on her right side; her cervical extension and flexion were twenty and thirty degrees, respectively; and her ability to turn left and right was limited to forty-five degrees.  (Id.).  Simmons would not attempt tilting side to side, and her twisting side to side was twenty degrees.  (Id.).  "The sarcroiliac joints and lumbosacral junction areas were tender."  (Id.).  Her straight leg raising was "normal when sitting but positive when supine at [thirty] degrees."  (Id.).  The circumference of Simmons' right calf was one inch smaller than her left.  (Id.).  Dr. Jones

diagnosed Simmons with "cervical and lumbar complaints," stating that her current injuries were causally related to her two auto accidents.  (Id.).  Dr. Jones assessed Simmons as suffering from a "marked disability," and he indicated that she was "unable to return to preloss activity levels," but capable of "sedentary work . . .  with no lifting, bending or reaching."  (Id. at 534).

On March 26, 2009, Dr. Roberto Rivera conducted a consultative internal medical examination of Simmons at the request of the Division of Disability Determination.  (Id. at 363-70).  Simmons complained of Raynaud's syndrome – that her hands felt cold regardless of the temperature – as well as "constant neck, back, bilateral shoulder[], and bilateral wrist[] pain" and "paresthesia of both . . . hands . . . with electric jolts and tinglings" following her two car accidents.  (Id. at 363-64).  With respect to her activities of daily living, Simmons reported that she was capable of cooking once a week with help, and could shower and dress herself daily with help.  (Id. at 364-65).  Cleaning and doing laundry, however, were very painful for her.  (Id. at 364).  In terms of recreation, Simmons reported that she listened to the radio, went out to dinner "occasionally," "socialize[d] with friends," and "collect[ed] silk flowers."  (Id. at 365).

Simmons did not present in acute distress, but "could not walk on [her] heels or toes without difficulty secondary to loss of balance and lower back pain," and could not squat.  (Id.).  She did not need assistive devices, and could rise from a chair without difficulty.  (Id.).

Dr. Rivera reported "[n]o scoliosis, kyphosis, or abnormality in Simmons' thoracic spine," but noted that Simmons could extend her lumbar spine only forty degrees before complaining of lower back pain; Simmons further had "lateral flexion at the lumbosacral spine to [twenty] to [twenty five] degrees which was normal bilaterally," and rotation to fifteen to twenty degrees before complaining about pain.  (Id. at 366).  A cervical x-ray of her spine revealed "reversal of the cervical curvature" and "degenerative spondylosis at C5-C6 and C6-C7," but "no compression fracture."  (Id. at 370).  With respect to straight leg raising, Simmons achieved five degrees on the lower left leg, and ten to fifteen degrees on the right leg, but complained of "severe pain . . . radiating down" her legs during these "maneuvers."  (Id. at 366).  Dr. Rivera noted that Simmons "did not make any major efforts to achieve any higher degrees of [straight leg raising]."  (Id.).  With respect to her shoulders, forward elevation was approximately 100 degrees and 70-80 degrees on the right and left, respectively, and abduction was 120 degrees and 90 degrees on the right and left, respectively.  (Id.).  Simmons complained of severe pain in executing these maneuvers with her left shoulder.  (Id.).  With respect to her wrists, Simmons stated that "numbness, tingling sensations, and cold sensations impair[ed] her dorsi-flexion and palmar-flexion," with the former limited to thirty degrees bilaterally, and the latter limited to thirty to forty degrees bilaterally.  (Id.).  Dr. Rivera noted that Simmons complained that her hands felt icy cold, but that they felt warm to his touch.  (Id. at 367).  With respect to her hips, Simmons stated that "pain in her hips and lower back impaired her from doing higher degrees of flexion and extension" than those

23

recorded.  (Id.).  Dr. Rivera reported that Simmons' "[s]trength was 3/5 in [her] upper

extremities and 3 to 4/5 in [her] lower extremities," but that "[p]art of this may have been

volitional" because Simmons "made no very strong efforts to do opposition strength

exercises of the upper/lower extremities."  (Id.).  Dr. Rivera noted that there were "[n]o

trigger points evident."  (Id.).

        Neurologically, Dr. Rivera found that Simmons' deep tendon reflexes were

"physiologic and equal in upper and lower extremities."  (Id.).  Attempts to have

Simmons discriminate between fine and dull were inconsistent.  (Id.).  There was "[n]o

muscle atrophy evident."  (Id.).  Hand and finger dexterity was intact, and while her grip

strength was "only [three] to [four] on bilateral hands," he noted that "[p]art of this may

have been volitional."  (Id)  Simmons was able to use a zipper and buttons, but was not

able to tie, claiming that her cold hands "precluded her [from] feeling the string."  (Id. at

367-68).

        Dr. Rivera diagnosed Simmons with possible Reynaud's syndrome, noting

that it was unclear whether this was verified; high blood pressure; and "[c]onstant pain in

the neck, back, shoulders, and wrists from car accident[s]."  He concluded that,

notwithstanding these conditions, Simmons' "[s]itting, standing, walking, and reaching

[were] unrestricted," while her "[p]ushing, pulling, and lifting [were] mildly to

moderately restricted," as were her "[c]limbing and bending."  (Id. at 368).

        On February 22, 2011, Simmons visited Dr. Daniel Perri for a pain

management examination that evidently had been requested in connection with her

second auto accident.  (Id. at 510-14).  Simmons reported neck pain radiating into her

right arm, a tingling sensation in her hands that caused her to drop objects, back pain, and

chronic shoulder pain that worsened with "abduction and activity."  (Id. at 510).  Dr.

Perri's physical examination revealed mildly decreased "[c]ervical active range of motion

. . . in all planes," tenderness "throughout the cervical, thoracic and lumbar paraspinals,"

and "mild scoliosis."  (Id. at 512).  Simmons exhibited strength of at least four out of five

in her upper extremities, although Dr. Perri observed that she did "not give full effort,"

and five out of five in her lower extremities.  (Id.).  Her upper and lower extremity

reflexes were described as "2+" and symmetric, and there was pinprick sensation and no

muscle atrophy.  (Id.).  Simmons' shoulder rotation was decreased by approximately fifty

percent.  (Id.).  Dr. Perri diagnosed Simmons as suffering from cervical spondylosis,

lumbar spondylosis, and bilateral rotator cuff disease – conditions that he opined

preexisted, but were exacerbated by, Simmons' September 2008 auto accident.  (Id.

at 513).  Dr. Perri noted that Simmons was not able to return to her pre-loss activity

levels, was restricted to lifting up to twenty-five pounds, and had to avoid overhead lifting

and "repetitive bending and twisting."  (Id.).  Dr. Perri also noted that Simmons would

"most likely require chronic treatment with medication," would "need to be seen on a

monthly basis by a pain management specialist," and might "require spinal injections."

(Id.).

          On March 15, 2011, Dr. Jeffrey Nugent reviewed the record, including an

RFC assessment dated March 3, 2011.  (See id. at 74-80, 521-22).  Dr. Nugent concluded

that Simmons could lift twenty pounds occasionally and ten pounds frequently, and could stand or walk and sit for between six and eight hours per day, but should be limited in kneeling, crawling and overhead reaching.  (Id. at 76-77, 521-22).

     C.    ALJ's Decision

In her decision, ALJ Edgell found that Simmons was not disabled within the meaning of the Act during the period from June 1, 2007 (Simmon' alleged onset date), through September 30, 2011 (her date last insured).  (See id. at 23-35).  In reaching this conclusion, the ALJ applied the five-step analytical framework required by 20 C.F.R. §§ 416.1520 and 416.920.  Simmons challenges the ALJ's findings only at Step Four, so that is the only step of the sequential process that requires discussion.

At Step Four, the ALJ concluded that Simmons retained the RFC to "lift/carry objects weighing a maximum of [twenty] pounds [occasionally] and [ten] pounds frequently," and "could sit, stand and walk up to six . . .  hours," but was "limited from frequent bending, twisting or overhead work."  (Id. at 26).  The ALJ reasoned that "the record fails to document the presence of a chronic spinal or musculoskeletal condition, which required persistent treatment in the presence of continuous symptoms," and that "the high degree of limited functioning alleged by the claimant" was not substantiated by the medical reports in the record.  (Id. at 29).

The ALJ found that while the record "reflect[ed] a multitude of subjective complaints" concerning Simmons' back and neck pain, the complaints were "not consistent with the objective medical data in either their nature or severity."  (Id. at 27).

26

In particular, the ALJ noted that the "MRI scans fail[ed] to demonstrate any acute pathology," or "evidence of herniation, nerve root impingement or significant stenosis." (Id.).  Subsequent "[x]-ray scans of the cervical spine" also failed to corroborate Simmons' complaints.  (Id.).  Physical examinations did not reveal "neurological abnormalities" consistent with Simmons' claims of numbness in her left hand, or back and left shoulder pain, and Simmons exhibited "essentially full" motion of her shoulder and cervical spine during examinations.  (Id.).

The ALJ found that Simmons' claims that her condition worsened following the September 2008 auto accident were similarly unsupported by objective medical evidence, and inconsistent with her demonstrated mobility.  (Id.).  The ALJ noted that Simmons' "range of motion to [her] shoulder, lumbosacral and cervical spine were almost full," and that she was able to "perform a full squat, from which she arose without assistance, and had no difficulty heel walking and toe walking," was able to dress herself without difficulty, "transitioned from sitting to standing with ease," and was "quite comfortable sitting for extended periods even though she alleged otherwise."  (Id. at 27-28).  In sum, the ALJ found that "[a]mple progress notes and evaluations from treating and examining physicians fail[ed] to substantiate muscle weakness or diminished sensation within the extremities consistent with [her] reported inability to maintain her stance, or lift and hold onto items."  (Id. at 28).

In assessing Simmons' credibility, the ALJ found that "many of the restrictions and deficits exhibited by [Simmons] during physical examination were partly

volitional," including her "apathetic" "efforts to perform strength testing and straight leg rais[ing]," refusal to perform "heel walking, toe walking or squatting" during a March 2009 consultative examination, and "less than full effort" during an assessment of the "strength in her upper extremities" in February 2011.  (Id. at 28-29).  The ALJ concluded that the "reports from both treating and examining physicians indicate[d] symptom magnification and lack of effort . . . during examination."  (Id. at 30).

The ALJ noted that some examinations did reveal "positive findings including diffuse tenderness along the lumbar and cervical spine;" "some impaired motion to [Simmons'] shoulders;" a diagnosis of Raynaud's syndrome; "some decreased motion to [Simmons'] neck, back and shoulders;" and "mild, subjectively-based strength deficits in the upper extremities."  (Id. at 27-29).  The ALJ thus credited the experts' opinions that Simmons should be "limited from performing overhead lifting, or repetitive bending or twisting," and also should be subject to "mild to moderate limitations for pushing, pulling and lifting[,] and moderate limitations for climbing and bending."  (Id. at 28-29).

Despite those restrictions, the ALJ found that Simmons exhibited "intact reflexes and sensation, as well as full motor strength in both upper and lower extremities," and that the "treatment notes from various physicians fail[ed] to reflect significant neurological deficits consistent with allegations of debilitating symptoms." (Id. at 28).  The ALJ therefore concluded there was no objective medical evidence of

atrophy, chronic spinal or musculoskeletal conditions, joint instability, or a limiting auto-immune disorder to substantiate Simmons' subjective claims.  (Id. at 28).

In the ALJ's view, there was "no medical basis for finding" that Simmons suffered from a condition that "had more than a moderate effect" on her daily life or on her ability to work.  (Id. at 29).  As a result, the ALJ concluded that Simmons  was not under a disability during the relevant period, as defined by the Act, and "was capable of performing [her] past relevant work as a hostess and a housekeeper," since the hostess position is "performed at a light exertion level without repetitive overhead work and postural activities."  (Id. at 30).

III.    Discussion

A.    Applicable Law

1.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the

evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo.  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence.  See Hickson v. Astrue, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011) (citing Schaal, 134 F.3d at 504).  When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position."  Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).  This means that the ALJ's factual findings may be set aside only if a reasonable factfinder would have had to conclude otherwise.  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012).

### 2.    Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(l).  For an

individual to be deemed disabled under the Act, her "physical or mental impairments" must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). The impairment must be one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3).

In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits h[er] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider h[er] disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform h[er] past work. Finally, if the claimant is unable to perform h[er] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof with respect to the first four steps of the five-step process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the Commissioner finds that a claimant is disabled (or not disabled) at an early step in the process, she is not required to proceed with any further analysis.  20 C.F.R. § 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work.  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).  When reviewing the medical evidence, the ALJ has the authority to select among conflicting opinions.  Veino, 312 F.3d at 588; see Richardson, 402 U.S. at 399.  Thus, if there are genuine conflicts within the evidence, their resolution is a matter committed to the Commissioner's discretion. See Dwyer v. Astrue, 800 F. Supp. 2d 542, 550 (S.D.N.Y. 2011) (citing Veino, 312 F.3d at 588).

Although the ALJ is required to follow the five-step sequential analysis and consider the above factors in making the disability determination, the ALJ need not state explicitly the reasoning for each step of the analysis.  "[T]he absence of an express

32

rationale for an ALJ's conclusions does not prevent [a court] from upholding them so long as [the court is] 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (quoting Berry, 675 F.2d at 469).

3.   Step Four Analysis

At the fourth step of the sequential analysis, the ALJ must determine whether the claimant's impairments prevent her from doing her past relevant work, taking into consideration the claimant's symptoms to the extent that they are consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f); 404.1560(b)(2). In doing so, the ALJ must determine the claimant's RFC, or what the claimant is able to do despite her impairments. Id. §§ 404.1545(a)(1). The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." SSR 96-8p, 1996 WL 374184, at *7 (1996). If the claimant can still perform her past relevant work, the ALJ must find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv).

The analysis at this level involves a two-part inquiry. First, the ALJ must consider whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms she alleges. Sarchese v. Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2 (1996)); 20 C.F.R. §§ 404.1529(b),

33

416.929(b).  Then, if the claimant makes statements about her symptoms that are not

substantiated by objective medical evidence, the ALJ must make a finding as to the

claimant's credibility and determine the extent to which her symptoms truly limit her

ability to perform basic work activities.  Sarchese, 2002 WL 1732802, at *7; SSR 96-7p,

1996 WL 374186, at *1.  A federal court must afford great deference to the ALJ's

credibility finding so long as it is supported by substantial evidence.  Bischof v. Apfel, 65

F. Supp. 2d 140, 147 (E.D.N.Y. 1999); see also Gernavage v. Shalala, 882 F. Supp. 1413,

1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination

because he heard [the claimant's] testimony and observed [her] demeanor.").

    4.   Treating Physician Rule

The "treating physician rule" requires an ALJ "to grant controlling weight

to the opinion of the claimant's treating physician if the opinion is well supported by

medical findings and is not inconsistent with other substantial evidence."[18]  Rosado v.

Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2)).  As the Second Circuit has explained, a treating physician's opinion is

typically accorded special consideration because of the "continuity of treatment he

provides and the doctor/patient relationship he develops" with the claimant, which

"place[s] him in a unique position to make a complete and accurate diagnosis of his

patient."  Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

---

[18]    The Regulations define a "treating source" as any "physician, psychologist, or other acceptable medical source who provides . . . medical treatment or evaluation and who has . . . an ongoing relationship with [the claimant]."  20 C.F.R. § 416.902.

Nonetheless, the Commissioner need not grant "controlling weight" to a treating physician's opinion as to the ultimate issue of disability, as this decision lies exclusively with the Commissioner.  See 20 C.F.R. § 404.1527(d)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  The Second Circuit similarly has acknowledged that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence and the report of a consultative physician may constitute such evidence."  Monegur, 722 F.2d at 1039 (internal citations omitted).  The Commissioner must, however, always provide "good reasons" for the weight, if any, he gives to the treating source's opinion.  20 C.F.R. § 404.1527(c)(2).  If the ALJ fails to apply the correct standard in weighing a treating physician's opinion or fails to give good reasons for rejecting the opinion, a remand for further fact finding is the appropriate remedy.  Halloran, 362 F.3d at 33; Dudelson v. Barnhart, No. 03 Civ. 7734 (RCC) (FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10, 2005) (citing Schaal, 134 F.3d at 506).

B.     Application of Law to Facts

As noted above, Simmons challenges the findings the ALJ reached at Step Four of the required analysis with respect to her RFC.  The ALJ determined in that regard that Simmons possessed the residual functional capacity to "lift/carry objects weighing a maximum of [twenty] pounds [occasionally] and [ten] pounds frequently," and "could sit, stand and walk up to six. . .  hours," but was "limited from frequent bending, twisting or

35

overhead work." (Tr. 26). The ALJ reached this determination following a review of the extensive medical record, concluding that Simmons did not possess a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms she alleged, and that Simmons' allegations concerning her pain and physical limitations were not entirely credible.

Simmons contends that the ALJ's decision at Step Four is unsupported by substantial evidence because the ALJ (1) erred in weighing and evaluating the medical opinion evidence in the record, (2) erred in assessing Simmons' credibility, and (3) failed to inquire into Simmons' past relevant work. I will discuss each of these assignments of error in turn.

1.    ALJ's Evaluation of the Medical Opinion Evidence

Simmons criticizes the ALJ's evaluation of the medical opinion evidence in two respects. First, although Simmons concedes that Dr. Perri was not a treating physician, she maintains that the ALJ should have adopted the full restriction on overhead reaching recommended by Dr. Perri because the ALJ indicated that she was affording Dr. Perri's opinion "great evidentiary weight." (Pl.'s Mem. at 14-15). Second, Simmons contends that the ALJ failed to cite, and therefore apparently did not adequately consider and weigh, the opinions of Drs. Jones and Bhanusali. (Id. at 16-19). On October 21, 2008, Dr. Jones opined that Simmons was "not able to return to preloss activity levels, including occupational duties . . . [and] must avoid lifting above shoulder level, bending and lifting of more than [ten pounds]." (Tr. 431). Thereafter, on February 3, 2009, Dr.

36

Bhanusali indicated that Simmons should be restricted to "modified work" not entailing "lifting more than [fifteen pounds.]"  (Id. at 338).

Dr. Perri's opinion does not require extended discussion.  As set forth in greater detail below, the job of restaurant hostess as performed in the national economy is one that entails only light exertion and does not require overhead lifting.  Accordingly, even if the ALJ erred by concluding that Simmons could lift overhead, so long as she did not have to do so "frequently," (see Tr. 26), and instead should have concluded that Simmons could do no overhead lifting, the outcome of the ALJ's decision would have been the same – namely, a finding of "no disability."  The ALJ's partial rejection of Dr. Perri's medical opinion therefore does not warrant a remand of this case.[19]

Turning to the other medical opinions that the ALJ is alleged to have considered inadequately, only Dr. Bhanusali was a treating physician.  In the course of his treatment, Dr. Bhanusali indicated that Simmons should be restricted to lifting no more than fifteen pounds.  (Id. at 338).  Although the ALJ did not expressly address this opinion, an "ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits us to glean the rationale of an ALJ's decision."   Cichocki v. Astrue, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (internal quotation marks omitted).

Here, the ALJ thoroughly reviewed Simmons' three-year medical history of treatment by Dr. Bhanusali (see Tr. 27), noting that over that time Simmons consistently

---

[19]     For the same reason, Dr. Jones' opinion that Simmons must "avoid lifting above shoulder level," (Tr. 431), does not warrant a remand.

exhibited only mild tenderness in her spine (id. at 320-21, 329, 334, 338), a nearly full

range of motion (id. at 320-21, 329, 334, 338), and no fracture or dislocation (id. at 320,

329).  After reviewing this and other aspects of Simmons medical history, the ALJ

concluded that Simmons could lift up to ten pounds frequently and twenty pounds at

most.  (Id. at 26).  Thus, rather than ignoring Dr. Bhanusali's opinion regarding

Simmons' capacity to lift overhead, the ALJ actually appears to have embraced it, making

a finding which is substantially the same as the conclusion that the doctor had reached.

Dr. Jones, of course, was not a treating physician.  In her decision, the ALJ

specifically discussed Simmons' second visit to Dr. Jones on June 1, 2010.  After that

visit Dr. Jones opined that Simmons had a "marked disability and [was] unable to return

to pre[-]loss activity levels in regard to both accidents," but could do "sedentary work . . .

with no lifting, bending or reaching."  (Id. at 29, 534).  This opinion is substantially

similar to Dr. Jones' prior opinion in October 2008 that Simmons alleges the ALJ

erroneously ignored.  In that opinion, Dr. Jones stated that Simmons "must avoid lifting

above shoulder level, [and] bending and lifting of more than [ten pounds]."  (Id. at 431).

In other words, Dr. Jones indicated, as he did in 2010, that Simmons was restricted to

sedentary work.  See 20 C.F.R. 404.1567(a) (defining sedentary work as involving

"lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like

docket files, ledgers, and small tools.").  The ALJ specifically rejected the notion that

Simmons was restricted to sedentary work on the ground that it was "inconsistent with the

generally mild to moderate findings reported within treatment records, as well as

[Simmons'] activities of daily living," and "other substantial evidence." (Tr. 29). This was not improper. Since Dr. Jones was not a treating physician, the ALJ was not required to defer to his opinion. See Cole v. Colvin, No. 1:12 CV 08597 (ALC), 2014 WL 1224568, at *4 (S.D.N.Y. Mar. 24, 2014) (where records are not from a treating physician, "the question [is] only what weight should be assigned to his opinion"). Moreover, the ALJ was correct in discounting Dr. Jones' opinion because it was contradicted by substantial evidence and inconsistent with the record as a whole. Snell, 177 F.3d at 133 ("[T]he less consistent [an] opinion is with the record as a whole, the less weight it will be given.") (citing 20 C.F.R. § 404.1527(d)(4)).[20] This would have been proper even if Dr. Jones had been a treating physician. See Cole, 2014 WL 1224568, at *3-4 (ALJ correctly declined to afford controlling weight to treating physicians' opinions because they were contradicted by other substantial evidence).

2.    Credibility Determination

Simmons next asserts that the ALJ's finding that Simmons' subjective complaints were "not totally credible" is not supported by substantial evidence. (Pl.'s Mem. at 20-21).

If a claimant's statements about her symptoms "are not substantiated by the objective medical evidence, 'the ALJ must engage in a credibility inquiry.'" Felix v. Astrue, No. 11 CV 3697, 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012) (quoting Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010)). Although the ALJ must "take

---

[20]    The cited regulation has been re-codified as 20 C.F.R. § 404.1527(c)(4).

the claimant's reports of pain and other limitations into account, he or she is not

require[d] to accept the claimant's subjective complaints without question." Campbell v.

Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (internal citations and quotation marks omitted).

"Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's

testimony in light of the other evidence in the record.'" Id. (quoting Genier v. Astrue,

606 F.3d 46, 49 (2d Cir. 2010)).

> In making a credibility determination, an ALJ must consider
>
> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain or other symptoms; (5) any treatment, other than medication, the claimant has received; (6) any other measures the claimant employs to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain or other symptoms.

Kane v. Astrue, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013) (citing 20 C.F.R.

§ 404.1529(c)(3)(i)-(vii)).  The ALJ need not discuss all the factors, however, "as long as

the decision includes precise reasoning, is supported by evidence in the case record, and

clearly indicates the weight the ALJ gave to the claimant's statements and the reasoning

for that weight."  Felix, 2012 WL 3043203, at *8 (citations omitted).  Thus, "the ALJ has

the discretion to evaluate the credibility of a claimant and to arrive at an independent

judgment . . . regarding the true extent of the pain alleged," and her decision to discount a

plaintiff's subjective complaints of pain must be upheld provided the findings are

supported by substantial evidence.  Martinez, 2012 WL 4761541, at *11 (internal

quotation marks omitted).

Here, the ALJ's determination that Simmons' statements about the severity

of her pain were not entirely credible is supported by substantial evidence.  Among other

factors that the ALJ cited were the absence of positive neurological findings (see, e.g., Tr.

303, 338, 351, 357, 393, 490); the radiological studies showing no disc herniation, nerve

root impingement or significant stenosis, fracture or tears (see, e.g., id. at 229, 231, 241-

42, 245, 254, 325-26, 329-30, 485, 529); the absence of muscle atrophy, sensory or reflex

deficits (see, e.g., id. at 303, 367, 477-78, 482, 487, 502, 512, 529, 533); and Simmons'

ability to perform certain daily tasks (see, e.g., id. at 301, 364-65).  Indeed, although

Simmons testified that her husband helped her extensively around their house, she

conceded that she bathed and dressed herself and prepared her own breakfast (id. at 55);

did light cleaning (id. at 62); sorted laundry (id.); worked on her Avon and gift-basket

ventures (id. at 57-60); attended community events (id. at 62-63); and walked twenty to

thirty minutes per day (id.).  (See also id. at 301, 364-65).  This evidence alone is

sufficient to overcome Simmons' credibility determination claim.

In addition, as the ALJ noted, Simmons had engaged in significant

"symptom magnification" and had displayed a "lack of effort . . . during examination[s]."

(Id. at 28, 30).  For example, on October 31, 2007, Dr. Sridaran reported that Simmons

was "guarded [and] lacking spontaneous movements," and that she had "voluntarily

restricted and guarded" her neck movements.  (Id. at 361).  On November 29, 2007, Dr.

Sridaran again noted that Simmons had "voluntarily restricted" and "voluntarily guarded" her movements (id. at 358), and he reported similar findings on November 4, 2008 (id. at 355), and February 10, 2009 (id. at 351).  Additionally, during a March 26, 2009 examination, Dr. Rivera noted that Simmons "did not make any major efforts to achieve any higher degrees" of straight leg raising when tested, and had not made "very strong efforts to do opposition strength exercises of the upper/lower extremities."   (Id. at 366-67).   Dr. Rivera further reported that results of strength testing in the extremities and hands "may have been volitional."  (Id. at 367).  Other doctors also detected a lack of effort on Simmons' part.  (See, e.g., id. at 502-03 (Dr. Weinstein reporting "decreased effort" and that Simmons "present[ed] with some degree of symptom amplification), 512 (Dr. Perri reporting that Simmons "[d]oes not give full effort" in upper extremity testing), 533 (Dr. Jones reporting that Simmons would not attempt to rotate her right shoulder), 529 (Dr. Degen reporting that Simmons exhibited "give way weakness" during her examination)).

Simmons now contends that she voluntarily restricted her physical responses to testing to avoid causing herself pain, and that in assessing her credibility the ALJ improperly failed to consider this explanation for her refusal to engage in certain movements.  (Pl.'s Mem. at 21).  Very few, if any, of Simmons' physicians cited a fear of pain as the reason that Simmons restricted her physical responses.  Moreover, while Simmons did complain of severe pain while she was being examined by Dr. Rivera, she also limited her execution of various examination maneuvers (id. at 365), and reported to

42

him that her hands were icy cold, even though this was objectively untrue (id. at 367).

Similarly, although Dr. Perri noted that Simmons' movements are "limited secondary to

pain" (id. at 512), he also reported that she had 4/5 strength in her upper extremities and

5/5 strength in her lower extremities, and that she "[did] not give full effort" (id. at 512).

"It is the function of the Secretary, not [courts], to resolve evidentiary conflicts and to

appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health

& Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).  Thus, the only question before the

Court with respect to the ALJ's credibility determination is whether her finding that

Simmons' assertions concerning her physical limitations were "not totally credible" is

supported by substantial evidence in the record.  Here, as noted, there is an abundance of

such evidence in the record.  Accordingly, the ALJ's decision in this regard must be

upheld.  Martinez, 2012 WL 4761541, at *11.

> 3.    Simmons' Ability to Perform Past Relevant Work

Finally, Simmons asserts that the ALJ erred at Step Four by failing to

inquire into Simmons' past work as a hostess and the amount of overhead lifting she

performed in the course of that job.  (Pl.'s Mem. at 21-22).  That argument is unavailing.

At Step Four, "the claimant has the burden to show an inability to return to her previous

specific job and an inability to perform her past relevant work generally." Jasinski v.

Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis in original).  Here, the ALJ

concluded that Simmons was "capable of performing past relevant work as a

hostess . . . [, which] did not require the performance of work related activities precluded

by [Simmons' RFC]."  (Tr. 30).  In reaching this conclusion, the ALJ reviewed the

Dictionary of Occupational Titles' entry for restaurant hostess, which states that a

restaurant host/hostess:

> Supervises and coordinates activities of dining room personnel
> to provide fast and courteous service to patrons:  Schedules
> dining reservations and arranges parties or special services for
> diners.  Greets guests, escorts them to tables, and provides
> menus. Adjusts complaints of patrons.  Assigns work tasks and
> coordinates activities of dining room personnel to ensure prompt
> and courteous service to patrons.  Inspects dining room serving
> stations for neatness and cleanliness, and requisitions table
> linens and other dining room supplies for tables and serving
> stations.   May interview, hire, and discharge dining room
> personnel.  May train dining room employees. May schedule
> work hours and keep time records of dining room workers.  May
> assist in planning menus.  May prepare beverages and expedite
> food orders.  May total receipts, at end of shift, to verify sales
> and clear cash register. May collect payment from customers[.]

DOT, Job Code No. 310.137-010, 1991 WL 672671.  The job consequently entails "light

work" and does not require significant overhead lifting.  Id.

The ALJ concluded that Simmons was capable of performing the job of

hostess as it is "generally performed in the national economy" because it is "performed at

a light exertion level without repetitive overhead work and postural activities."  (Tr. 30).

Simmons challenges the fact that she had the RFC to perform a job at the light exertional

level involving no overhead lifting.  (Pl.'s Mem. at 17, 19-20).  However, even if the

Court were to assume that Simmons' prior hostess job was unusual in that it required

overhead lifting, the ALJ clearly was entitled to find her "not disabled" because the job

does not require such work as it is generally performed in the national economy.  See

SSR 82-62, 1982 WL 31386, at *3 (1982) ("The RFC to meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy) is generally a sufficient basis for a finding of 'not disabled.'"). Simmons' contention that the specific work she did as a hostess precludes her returning to her former job consequently is not a basis for a remand to the Commissioner.

IV.     Conclusion

For the foregoing reasons, the ALJ's decision is both legally correct and supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings, (ECF No. 21), is granted, and Simmons' cross-motion, (ECF No. 23), is denied. In light of this disposition, the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:        New York, New York
              May 8, 2015


                                              _____
                                              FRANK MAAS
                                              United States Magistrate Judge


Copies to all counsel via ECF

45